UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

15 CV 03576

--------------------------------------------------------X

| | |
|---|---|
| LYNN W. TUCKER, Individually, on Behalf of Herself and All Others Similarly Situated, | Civil Action No. _____ |
| Plaintiff, | CLASS ACTION COMPLAINT |
| v. | DEMAND FOR JURY TRIAL |
| UNITED PARCEL SERVICE, INC. and THE UPS STORE, INC. | |
| Defendant. | |

RECEIVED
MAY 0 7 2015
U.S.D.C. S.D. N.Y.
CASHIERS

--------------------------------------------------------X

Plaintiff, Lynn W. Tucker, individually and on behalf of all others similarly situated, by her attorneys, KamberLaw, LLC, makes the following allegations based on personal knowledge of her own acts and observations and, otherwise, on information and belief based on investigation of counsel.

## I. INTRODUCTION

1.      United Parcel Service, Inc. and The UPS Store, Inc. have been charging consumers inflated UPS Air rates for packages that never leave the ground.

2.      On behalf of herself and other victims, Ms. Tucker demands that United Parcel Service, Inc. and The UPS Store, Inc. pay customers back and stop misleading them about shipping options and costs.

3.      The allegations in this complaint arise from conduct and circumstances during the period of August 30, 2011 to the present (the "Relevant Period").

## II.  JURISDICTION AND VENUE

4.      This Court has subject-matter jurisdiction over the this action pursuant to Title 28, United States Code, Section 1332, as amended by the Class Action Fairness Act of 2005, in that (a) the aggregate claims of Plaintiff and the proposed Class Members exceed the sum or value of $5,000,000, exclusive of interest and costs; (b) minimal diversity of citizenship exists between members of the proposed Class and Defendants; and (c) the proposed Class consists of more than one hundred members.

5.      Venue is proper in this District under Title 28, United States Code, Section 1391(b) because Defendants do business throughout this District, Plaintiff purchased and utilized Defendants' services in this District, and Plaintiff resides in this District.

## III.  PARTIES

### A.  Plaintiff

6.      Lynn W. Tucker has resided in the City, County, and State of New York throughout the Relevant Period and, from late 2011 to early 2014, was overcharged by Defendants for packages she shipped from The UPS Store at a Manhattan location.

### B.  Defendants

7.      **United Parcel Service, Inc. ("UPS")** is a corporation organized and existing under the laws of the State of Delaware and has its principal place of business at 55 Glenlake Parkway NE, Atlanta, Georgia 30328. UPS's agent for service of process is Corporation Service Co., 80 State Street, Albany, New York, 12207-2543.

8.     UPS publicly represents on its website that it is the world's largest package delivery company and that its offerings include services provided by "retail locations" operating as "The UPS Store."

9.     **The UPS Store, Inc. ("TUPSS")**, known until October 1, 2012 as Mailboxes Etc., Inc., is a corporation organized and existing under the laws of the State of Delaware and has its principal place of business at 6060 Cornerstone Court West, San Diego, California 92121. TUPSS's agent for service of process is Corporation Service Co., 80 State Street, Albany, New York, 12207-2543.

10.     TUPSS is a wholly owned subsidiary of United Parcel Service, Inc.

11.     TUPSS is a franchisor and owner of retail outlets ("Retail Outlets" operated by "Retailers") selling goods and services that include the shipment of consumers' packages via UPS.

12.     Over 4,400 U.S. Retail Outlets are TUPSS franchises operating under the brand, "The UPS Store." Hundreds of TUPSS Retail Outlets are located in New York, including approximately 43 franchises in Manhattan.

13.     An unknown number of Retail Outlets are operated by TUPSS or its designees in locations such as airports, college campuses, military installations, shopping malls, office buildings, and retailers such as Staples.

14.     As further alleged in section IV.D on page 9, below, the consuming public reasonably believes Retailers are Defendants' employees or agents, and Defendants hold out Retailers as their agents and control their charging practices, including by providing the

computerized Counter Manifest System that Retailers use to determine available UPS shipping options and to print UPS shipping labels.

## IV.  ALLEGATIONS OF FACT

### A.  Consumers are misled about and overcharged for UPS services

15.     UPS retail services include date-guaranteed delivery of packages, whether packages are shipped by UPS Ground or UPS Air.

16.     Shipping a package via UPS Air costs a consumer more than UPS Ground, because UPS's rates for transporting packages by UPS Air are typically at least twice the rates for UPS Ground.

17.     Total shipping charges also include an added air or ground fuel surcharge, which UPS calculates as a percentage of the rate-based shipping cost. UPS adjusts its fuel surcharge rates monthly. From 2011 to 2014, UPS's air fuel surcharge for UPS Air shipments averaged approximately 10 to 13 percent and its ground fuel surcharge for UPS Ground shipments averaged approximately 7 to 8 percent.

18.     For shipments between certain areas of the United States, UPS guarantees delivery by the second business day either UPS Ground or UPS 2nd Day Air.

19.     For shipments within areas of nearby states, UPS transports shipments by UPS Ground and guarantees delivery by the next business day. (See Figure 1 on page 5, below, highlighting one-day transit for shipments originating in New York City sent to destinations from northern New York and Massachusetts to Maryland.)

Figure 1. Guaranteed UPS Ground delivery for shipment from NYC
Screen image from *http://www.ups.com/maps/printerfriendly*, May 4, 2015



20.     For areas in which UPS guarantees next-day delivery by UPS Ground, UPS does not even provide 2nd Day Air service  (See, *e.g* , Figure 2 on page 6, below: to ship a package from New York City to Hartford, Connecticut, UPS does not list UPS 2nd Day Air as an option.)

21.     But when consumers ship packages within areas where UPS provides no UPS 2nd Day Air service, Retailers sell the service to the consumers, anyway.

22.     As a result, consumers pay for UPS 2nd Day Air services that cost most than the UPS Ground services used to transport their packages.

Figure 2. UPS time and cost calculation for shipment from NYC to Connecticut

Screen image from *Shipping > Calculate Time and Cost*,
*https://wwwapps.ups.com/ctc/request?loc=en_US*, May 4, 2015



23.     As alleged below, Defendants are aware that Retailers sell nonexistent UPS 2nd Day Air services, and Defendants enable, encourage, and profit from the practice.

24.     To sell nonexistent UPS 2nd Day Air services to consumers, Retailers or their employees ("Representatives"): tell consumers that guaranteed UPS 2nd Day Air service is available, when it is not; fail to disclose that guaranteed, next-day UPS Ground service is available; tell consumers that delivery dates for UPS Ground service cannot be guaranteed; and tell consumers that UPS Ground service delivery dates are greater than they actually are.

25.     Defendants encourage Retailers' practice of selling nonexistent UPS 2nd Day Air services by providing and requiring Retailers to use the computerized Counter Manifest System to determine available UPS services, calculate shipping costs, and print UPS shipping labels. The Counter Manifest System, which is licensed by a UPS subsidiary, allows Retailers to print UPS 2nd Day Air shipping labels, even when UPS does not actually provide the service.

26.     UPS gives Retailers substantial "incentive discounts" to encourage Retailers to sell UPS 2nd Day Air services. For example, when a customer ships a two-pound package via UPS Air, UPS then invoices the Retailer for the shipment, but reduces the invoice amount by applying an incentive discount ranging from 40 to 60 percent of the retail cost of the shipment.

27.     In addition to selling consumers more costly, nonexistent UPS 2nd Day Air services, Representatives further increase shipping costs by inflating the package dimensions they enter in the Counter Manifest System.

28.     Further, for any packages consumers pay to send via UPS Air, UPS frequently ships the packages by ground.

29.     As a result of the practices alleged in the foregoing paragraphs, consumers pay for UPS Air services—at higher shipping and fuel surcharge costs—than the UPS Ground services by which the packages are actually transported, and consumers often pay for false package dimensions that are greater than their actual package dimensions.

**B.  UPS and TUPSS are aware and retain records of consumers' overpayments**

30.     UPS and TUPSS retain records from Retailers' point-of-sale ("POS") systems and credit card billing that detail the amounts consumers paid for services.

31.     UPS and TUPSS retain records of Counter Manifest System information used to initiate and track shipments of consumers' packages, and which discloses the UPS rates and costs for UPS Air services consumers purchased and the ground services UPS actually provided.

32.     UPS detects and retains records of Retailers' entry of inflated package dimensions alleged in paragraph 27 because UPS measures each package using a multidimensional measurement system.

33.     Further, through Defendants' monitoring, investigation, and auditing of Retailers' practices, Defendants are aware of Retailers' nondisclosure and mischaracterization of UPS services alleged above in paragraph 24.

## C. Consumers are unaware they were misled and overpaid for UPS services

34.     Based on the facts alleged in this section IV.C, Plaintiff and Class Members were not aware of and have had no reasonable means by which to know that they paid for UPS Air services that cost more than the UPS Ground services by which their packages were actually transported.

35.     Retailers' Representatives frequently do not give consumers receipts from the Retailers' POS systems and, when they do, POS system receipts often do not contain package dimensions  or charge details.

36.     Even when Representatives do provide shipment details, inflated dimensions are difficult to detect because the Counter Manifest System calculates UPS Air costs according to a package's "billable weight," which is computed using a formula based on package dimensions. (See, *e.g*., Figure 2 on page 6, above, showing a package weight of 10 pounds and billable weight of 29 pounds.)

37.     Because Retailers and UPS conceal overcharges, as alleged in the foregoing paragraphs, consumers have no reasonable means of discovering their overpayments at the time of the transactions.

38.     In addition, consumers have no reasonable means of discovering that, when UPS transports their packages, it does so by ground even though the consumers paid for UPS Air services.

39.     As alleged in section IV.B on page 7, above, Defendants were aware consumers were paying for UPS Air services that cost more than the UPS Ground services by which their packages were actually transported, and Defendants control the information detailing such overpayments.

40.     However, Defendants did not disclose this information to affected consumers, and Defendants allowed the overcharging practices to continue.

41.     On May 8, 2014, in the matter of *3A, Inc., et al. v. Atlantic Mailboxes Inc., et al.*, Index No. 650013/14 (N.Y. Co. Sup. Ct.), certain former TUPSS franchisees filed affidavits stating that virtually all Manhattan Retailer-franchisees and UPS had engaged in the practices such as those described in section IV.A, above. *Id.*, Doc. No. 45 (Affidavit of Paul Puccini) and Doc. No. 61 (Affidavit of Robert Hagan).

42.     Prior to the filing of the above-mentioned action, consumers had no reasonable means to be aware of UPS and TUPSS's overcharging practices.

**D.  Defendants hold out Retailers as their agents and control their charging practices**

43.     Based on the facts alleged in this section IV.D: (i) the consuming public reasonably perceives Retailers to be Defendants' employees or agents; (ii) Retailers act as Defendants' agents in charging and obtaining payment from consumers who ship packages via

9

UPS; and (iii) Defendants control, operate, manage, and supervise the shipment of consumers' packages via UPS and Retailers' practices in charging consumers to ship those packages.

### i. *Retail Outlet identity*

44. TUPSS prescribes that a Retailer identify itself only with trademarks, designs, and branding elements specified by TUPSS.

45. TUPSS controls the interior and exterior design, construction, appearance, furnishing, maintenance, and updating of Retail Outlets, including locations of walls, furniture, fixtures, equipment, and displays, and requires that any construction design or general contracting for a Retail Outlet be performed by TUPSS's employees or designees.

46. TUPSS requires that Retail Outlet storefronts identify themselves with its trademarked brand, "The UPS Store" using consistent and recognizable design elements.

47. The logo identifying Retail Outlets as "The UPS Store" incorporates the UPS logo—a shield containing the letters "UPS."

48. The logo identifying Retail Outlets as "The UPS Store" communicates and is intended to communicate to consumers that Retail Outlets are under UPS's ownership, control, operation, management, and supervision.

49. The incorporation of the UPS logo into The UPS Store logo reinforces the message of unitary ownership, control, operation, management, and supervision by UPS.

50. The capitalization of "The" in "The UPS Store" reinforces the message of unitary ownership, control, operation, management, and supervision by UPS.

51. In addition, through UPS's online package tracking system and 1-800 numbers, UPS communicates directly with consumers regarding packages they ship at Retail Outlets,

which reinforces the appearance of ownership, control, operation, management, and supervision of Retail Outlets by UPS.

### ii. *TUPSS control over Retailers and their charging practices*

52.     TUPSS requires that Retailers license and use specified computer hardware, software, and systems, including the Counter Manifest System and POS systems used in initiating consumers' package shipments and charging consumers for them.

53.     TUPSS prescribes that Retailers charge UPS-approved rates to ship packages for consumers via UPS and publicly states that Retail Outlets ship packages for consumers at "UPS-direct shipping rates."

54.     TUPSS prescribes written standards and specifications for Retail Outlet operations, including Retailers' sales practices and use of the Counter Manifest System and POS systems.

55.     TUPSS prescribes that Retailers complete certain training to TUPSS's satisfaction, in its sole subjective judgment, including training regarding Retail Outlet implementation, management, and operation, including training in the use of the Counter Manifest System and POS systems.

56.     TUPSS prescribes that Retailers ensure that employees are adequately trained according to curricula and certification forms prescribed by TUPSS.

57.     TUPSS has the authority and means to audit and investigate Retailers' transactions with consumers, and to penalize and take other action against Retailers for violations of its prescribed policies and procedures.

58.     TUPSS requires that Retailers agree to UPS's requirements, including those alleged in the following section IV.D.iii.

### *iii. UPS control over Retailers and their charging practices*

59.     UPS requires that Retailers agree to TUPSS's requirements, including the TUPSS requirements alleged in the foregoing section IV.D.ii.

60.     UPS publicly represents that Retail Outlets operating as "The UPS Store" offer "our products and services," including shipping.

61.     UPS publicly represents that Retailers in locations such as Staples stores are "our retail locations."

62.     UPS requires that it be Retailer-franchisees' preferred and recommended shipper.

63.     UPS prescribes that Retailers only charge UPS-approved prices for shipping consumers' packages via UPS.

64.     UPS requires that Retailers use the TUPSS-prescribed Counter Manifest System to price ship consumers' packages shipped via UPS.

65.     Retailers must license the Counter Manifest System from iShip, Inc., a wholly owned subsidiary of UPS.

66.     UPS is authorized to audit Retailers' practices in charging consumers to ship packages via UPS.

67.     UPS processes consumer package shipments with a multidimensional measurement system that monitors the accuracy of the package measurements Retailers enter in the Counter Manifest System.

68.     UPS retains records of its package processing that reveal discrepancies between actual shipment characteristics and information entered in the Counter Manifest System.

### E.  Defendants retain the benefits of overpayments

69.     Retailer-franchisees must make monthly payments to TUPSS based on a percentage of their gross sales. Those payments include royalties and fees for TUPSS-controlled national advertising and marketing co-op activities.

70.     Through royalty and fee payments from Retailer-franchisees and income from its company-owned operations, TUPSS retains benefits from overpayments.

71.     Through income from its company-owned retail operations, TUPSS retains benefits from overpayments.

72.     UPS invoices Retailers weekly for transport and delivery of consumers' packages shipped from Retailers.

73.     As alleged in paragraph 26, above, UPS encourages Retail sales of services such as UPS Air, that cost more than UPS Ground, by applying substantial incentive discounts that reduce invoice amounts that UPS charges Retailers for its shipping services.

74.     Some Retailers obtain further invoice reductions from UPS by retaining consultants to analyze UPS invoices and request refunds of overpaid amounts.

75.     Retailers have not refunded these overpaid amounts to consumers and Defendants have not required them to do so, and Defendants have not done so.

76.     When UPS, during routine package processing, has detected overcharges of the types alleged above, UPS has not disclosed the overcharges to consumers, refunded overpaid amounts, or caused TUPSS or Retailers to do so.

77.     When TUPSS has detected overcharges of the types alleged above, it has not disclosed the overcharges to consumers, refunded overpaid amounts, or caused Retailers to do so.

**F.  Plaintiff was harmed by Defendants' practices**

78.    Since in or about December 2011, Ms. Tucker has shipped numerous packages from Manhattan Retailer locations, including packages she shipped via UPS 2nd Day Air that she would have shipped via UPS Ground, had she been informed that it was available, that its delivery date was guaranteed, and that it would be used to transport her packages even though she paid for UPS Air service.

79.    Ms. Tucker reasonably believed that the Retailer location she patronized was owned, controlled, operated, managed, or supervised by TUPSS and UPS, or authorized by TUPSS and UPS to act as their agent.

80.    Ms. Tucker reasonably believed she was charged authorized UPS rates based on the actual dimensions of the packages she shipped, and that she was provided UPS 2nd Day Air services that UPS actually offered and used in transporting her packages.

81.    Ms. Tucker believes she was misled about the availability of less costly UPS Ground services and overpaid for her shipments purportedly sent by UPS Air but that were actually transported by ground.

## V.  CLASS ALLEGATIONS

82.    Pursuant to Rules 23(a) and (b)(1) through (b)(3) of the Federal Rules of Civil Procedure, Plaintiff brings this action as a class action on behalf of herself and all other similarly situated persons (putative "Class Members") defined as follows:

> *"National Class"*: All consumers residing in the United States who, since August 30, 2011, paid for shipping by UPS Air services but whose packages were transported by UPS Ground services, and including consumers who paid for the shipment of packages that were over-measured.

> "*New York Sub-Class*": All consumers residing in the State of New York who are members of the National Class.

83.     Excluded from the Class are Defendants, their legal representatives, assigns, and successors, and any entities in which Defendants have controlling interests. Also excluded is the judge to whom this case is assigned and the judge's immediate family, and staff.

84.     The "Class Period" is defined as August 30, 2011 to the date of class certification in this matter, inclusive.

85.     Plaintiff reserves the right to revise the definitions of the Class based on facts learned in the course of litigating this matter.

86.     The Class consists of thousands of individuals and other entities, making joinder impractical.

87.     Plaintiff's claims are typical of the claims of all other Class Members.

88.     Plaintiff will fairly and adequately represent the interests of the other Class Members. Plaintiff has retained counsel with substantial experience in prosecuting complex litigation and class actions. Plaintiff and her counsel are committed to prosecuting this action vigorously on behalf of proposed Class Members and have the financial resources to do so. Neither Plaintiff nor her counsel has any interests adverse to those of the other Class Members.

89.     Absent a class action, most Class Members would find the costs of litigating their claims to be prohibitive and would have no effective remedy.

90.     The class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation in that it conserves the resources of the courts and the litigants, and promotes consistency and efficiency of adjudication.

91.     Defendants have acted and failed to act on grounds generally applicable to Plaintiff and other Class Members, requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members.

92.     The factual and legal bases of Defendants' liability to Plaintiff and other Class Members are the same, resulting in injury to Plaintiff and all of the other Class Members. Plaintiff and other Class Members have all suffered harm and damages as a result of Defendants' wrongful conduct.

93.     There are many questions of law and fact common to Plaintiff and the Class Members, and those questions predominate over any questions that may affect individual Class Members. Common questions for the Class include, but are not limited to the following:

a.     Whether Defendants' conduct alleged herein was consumer-oriented;

b.     Whether Defendants controlled, operated, managed, or supervised the shipment from Retail Outlets of Plaintiff and Class Members' packages via UPS and Retailers' practices in charging Plaintiff and Class Members to ship packages via UPS;

c.     Whether Retailers and their employees acted as Defendants' agents when charging and obtaining payment from Plaintiff and Class Members who shipped packages via UPS;

d.     Whether Retailers acting under the control of or as agents for Defendants misled Plaintiff and Class Members in material respects in the course of providing UPS shipping services;

e.     Whether Defendants misled Plaintiff and Class Members in material respects in the course of providing UPS shipping services;

f.      Whether Retailers acting under the control of or as agents for Defendants deceived Plaintiff and Class Members as to what shipping services were available;

g.      Whether Defendants deceived Plaintiff and Class Members as to what shipping services were available;

h.      Whether Defendants and Retailers acting under the control of or as agents for Defendants deceived Plaintiff and Class Members as to what shipping services were used to transport Plaintiff and Class Members' packages;

i.      Whether Plaintiff and Class Members paid shipping charges and air fuel surcharges for UPS Air services for packages that UPS transported by ground;

j.      Whether Retailers acting under the control of or as agents for Defendants deceived Plaintiff and Class Members as to the dimensions of Plaintiffs and Class Members' packages;

k.      Whether Retailers acting under the control of or as agents for Defendants concealed inflated shipping charges from Plaintiff and Class Members;

l.      Whether Defendants concealed inflated shipping charges from Plaintiff and Class Members;

m.      Whether Plaintiff and Class Members paid shipping charges based on inflated package dimensions;

n.      Whether Defendants and Retailers acting under the control of or as agents for Defendants concealed from Plaintiff and Class Members that Plaintiff and Class Members paid for services that UPS did not perform;

o.      Whether UPS concealed the overcharging of Plaintiff and Class Members after it detected overcharges in the course of its processing of packages;

p.      Whether UPS concealed the overcharging of Plaintiff and Class Members when UPS deducted or refunded overcharge amounts from its invoices to Retailers, allowing Retailers and TUPSS to realize the benefit of overcharges, to the exclusion of remedying Plaintiff and Class Members' overpayments;

q.      Whether Plaintiff and Class Members were deceived by Defendants' representations or omissions, in Defendants' failures to remedy overcharging of Plaintiff and Class Members when TUPSS audited or otherwise detected overcharging by Retailers;

r.      Whether Defendants retained Retailer invoice payments that consisted of Plaintiff and Class Members' overpayments, knowing that Plaintiff and Class Members had overpaid for UPS's services;

s.      Whether Plaintiff and Class Members were deceived by Defendants' representations or omissions in Defendants' ongoing facilitation of overcharging practices;

t.      Whether Defendants' foregoing conduct was knowing and willful; and

u.      Whether Defendants have been unjustly enriched.

94.     The questions of law and fact common to Class Members predominate over any questions affecting only individual members, and a class action is superior to all other available methods for the fair and efficient adjudication of this controversy.

## VI.  CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

**Violation of Section 349 of New York General Business Law
Deceptive Acts and Practices
(On Behalf of Plaintiff and the New York Sub-Class)**

95.     Plaintiff incorporates the above allegations by reference as if fully set forth herein.

96.     New York General Business Law, Section 349, makes it illegal to engage in deceptive acts or practices in the conduct of any business, trade, or commerce or in the furnishing of any service in the State of New York.

97.     Defendants, and Retailers acting as their agents or under their control, engaged in acts and omissions generally directed at the consuming public and are consumer-oriented in that they arose from providing package shipping services to consumers in the State of New York and the conduct of business related to the provision of those services.

98.     Retailers and UPS's practices were materially misleading in that consumers were sold UPS Air services that did not exist and were more costly than UPS Ground services that did exist and were used to transport consumers' packages.

99.     Retailers and UPS's practices were materially misleading in that consumers were charged for UPS Air services that were not provided, because UPS actually transported consumers' packages by ground.

100.    Retailers' practices were materially misleading in that Retailers charged consumers for package dimensions greater than those of consumers' packages, so that consumers overpaid for UPS services.

101.    Defendants' practices, including those alleged above in sections IV.A through IV.C, were materially misleading and constituted material omissions in that Defendants were aware of the overcharging of and overpayments by consumers and failed to provide consumers reasonable notice of proper costs for their UPS shipments.

102.    Defendants' practices, including those alleged above in sections IV.B through IV.E, were materially misleading and constituted material omissions in that Defendants were aware of the overcharging of and overpayments by consumers, yet Defendants retained the

benefits of such overpayments and allowed Retailers to retain such benefits that rightfully belonged to the affected consumers.

103.     Defendants' practices, including those alleged above in sections IV.A through IV.D, were materially misleading and constituted material omissions in that Defendants were aware of Retailers' overcharging practices yet allowed Retailers' to continue such practices.

104.     The practices alleged in the foregoing paragraphs of this First Claim for Relief were dishonest or misleading in material respects, in that consumers were deceived as to the character of the services for which they paid and as to the availability of less costly services and so deprived consumers of information by which they could make free and intelligent choices to purchase those services as opposed to other UPS services, or other services available in the marketplace.

105.     The practices alleged in the foregoing paragraphs of this First Claim for Relief were consumer-oriented in that they involved the sales of services to consumers, the fulfillment of services for which consumers paid, and the retention of benefits of consumers' overpayments.

106.     The practices alleged in the foregoing paragraphs of this First Claim for Relief were likely to mislead a reasonable consumer acting reasonably under the circumstances in that consumers did not have reasonable means to be aware of the practices at the time of their transactions, as alleged above in section IV.C.

107.     The practices alleged in the foregoing paragraphs of this First Claim for Relief were likely to mislead a reasonable consumer acting reasonably under the circumstances in that consumers did not have reasonable means to become aware of the practices after their transactions, because UPS and TUPSS failed to disclose their discovery, monitoring,

investigation, and audit that revealed such practices and, instead, retained and shared with each other and Retailers the benefits of consumers' overpayments.

108.    The practices alleged in the foregoing paragraphs of this First Claim for Relief were likely to mislead a reasonable consumer acting reasonably under the circumstances in that consumers did not have reasonable means to become aware of the practices after their transactions, because UPS and TUPSS engaged in and discovered such practices but allowed them to continue.

109.    Therefore, Defendants' practices, including the practices of Retailers' whose practices Defendants control, were deceptive, in violation of Section 349 of New York's General Business Law.

110.    Plaintiff and Class Members are consumers who were subjected to the deceptive practices alleged in the foregoing paragraphs of this First Claim for Relief and, because of those practices, overpaid for the shipments of packages via UPS, causing them harm.

111.    Further, as alleged herein, Defendants' conduct was willful and knowing in that it was it was conducted and continued with Defendants' knowledge of the practices and Defendants knowingly retained the benefits of overcharging they received from Retailers' payments.

112.    Because Defendants' violations of Section 349 of New York's General Business Law have damaged Plaintiff and other Class Members and Defendants' continued violations threaten additional injury for which Plaintiff and Class Members have no adequate remedy at law, Plaintiff seeks an order pursuant to Section 349 of the New York General Business Law, enjoining Defendants from such future conduct.

113.    Pursuant to Section 349 of the New York General Business Law, Plaintiff seeks actual, statutory, and treble damages, costs and expenses, pre and post-judgment interest, and attorneys' fees.

## SECOND CLAIM FOR RELIEF

### Unjust Enrichment
### (On Behalf of Plaintiff and the National Class)

114.    Plaintiff incorporates the above allegations by reference as if fully set forth herein.

115.    Common law prohibits breaches of contract, including breach of a contract implied under the circumstances of a relationship between parties, where such breach results in the unjust and inequitable enrichment of one party at the expense of another.

116.    Common law prohibits one party's possession of money that belongs to another and that, in the absence of an agreement, and in equity and good conscience, the party possessing such money ought not retain.

117.    Through conduct alleged in this Complaint, which was undertaken by Defendants or actors under their ownership, control, management, or supervision, Defendants overcharged Plaintiff and Class Members.

118.    The amounts by which Plaintiff and Class Members overpaid have been retained by or are under the control of Defendants, but rightfully belong to Plaintiff and Class Members.

119.    Defendants' retention of those benefits constitutes their unjust enrichment at the expense of Plaintiff and Class Members.

120.    Defendants appreciate and have knowledge of such benefits.

121.    Under principles of equity and good conscience, Defendants should not be permitted to retain the revenue that they acquired by virtue of their unlawful conduct. All funds,

revenue, and benefits received by Defendants rightfully belong to Plaintiff and the Class, which Defendants have unjustly received as a result of their actions.

122.    Plaintiff and Class Members have no adequate remedy at law.

123.    As a result of Defendants' wrongful retention of benefits to which Plaintiffs are entitled, Plaintiffs have suffered substantial damages and losses and are entitled to recover benefits wrongfully retained by Defendants and such other relief as this Court deems just and proper.

## DEMAND FOR RELIEF

WHEREFORE, Plaintiff, on behalf of herself and all others similarly situated, prays for judgment against Defendants and that the Court may:

A.    certify this case as a Class action on behalf of the Classes defined above, appoint Plaintiff as Class representative, and appoint her counsel as Class counsel;

B.    declare that Defendants' actions, as set forth above, violate New York General Business Law, Section 349; and such common-law torts as are alleged above;

C.    award preliminary and permanent injunctive and equitable relief as applicable to the Class *mutatis mutandis*, including that:

   i.    Defendants be restrained from overcharging consumers by material misrepresentations such as alleged in this complaint;

   ii.    Defendants be restrained from overcharging consumers by material omissions such as alleged in this complaint;

   iii.    Defendants account for overpayments consumers have paid when shipping packages from Retail Outlets;

iv.    Defendants reasonably inform consumers of the charges and delivery guarantees for all available shipping services;

v.    Defendants reasonably inform consumers, in writing, of the bases of shipping costs for packages consumers ship from Retail Outlets;

vi.    Defendants reasonably inform consumers, in writing, of actual dimensions of packages consumers ship from Retail Outlets;

D.    award damages, including statutory and treble damages where applicable, to Plaintiff and Class Members in an amount to be determined at trial;

E.    award restitution against Defendants for all money to which Plaintiff and the Class is entitled in equity;

F.    award Plaintiff and the Class their reasonable litigation expenses and attorneys' fees; pre- and post-judgment interest to the extent allowable; and

G.    such other relief as this Court deems just and proper.

Case 2:15-cv-06114-GW-PJW   Document 1   Filed 05/07/15   Page 25 of 25   Page ID #:25

## VII. JURY TRIAL DEMAND

Plaintiff hereby demands a trial by jury of all issues so triable.

Dated: May 7, 2015

Respectfully submitted,

KamberLaw, LLC

By: _David A. Stampley_

David A. Stampley
One of the attorneys for Plaintiff, individually and
on behalf of a class of similarly situated individuals

Scott A. Kamber
skamber@kamberlaw.com
KamberLaw, LLC
100 Wall Street, 23rd Floor
New York, New York 10005
Telephone: (212) 920-3072
Facsimile:  (212) 202-6364

David A. Stampley
dstampley@kamberlaw.com
KamberLaw, LLC
100 Wall Street, 23rd Floor
New York, New York 10005
Telephone: (212) 920-3072
Facsimile:  (212) 202-6364

Stuart L. Cochran (*pro hac vice* to be submitted)
KamberLaw, LLC
4514 Cole Avenue, Suite 600
Dallas, Texas 75205
Phone:      (214) 300-1765
Facsimile:  (214) 559-7101

25